IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

In re:

RENEW ENERGY, LLC                                    (Chapter 11)

        Debtor.                                        Case No. 09-10491

Renew Energy, LLC,

        Plaintiff,

v.                                                   Adv. No. 09-154

Olsen's Mill, Inc.,

        Defendant.

MEMORANDUM DECISION

      Renew Energy, LLC initiated this adversary proceeding to avoid certain preferential transfers. After a trial, I decided on the record that Renew had proved all the elements of an "insider" preference under 11 U.S.C. § 547(b). However, I took under advisement the affirmative defenses raised by Olsen's Mill.

      Renew operated an ethanol plant in Aztalan, Wisconsin, which processed large quantities of corn. Renew signed a contract with Olsen's Mill in September 2006, pursuant to which Olsen's Mill supplied enough corn to run Renew's plant. Olsen's Mill began to bill Renew on September 25, 2007. The parties had agreed that the payment terms were to be net 10 days, even

1

though each invoice stated a term of net 20 days. Olsen's Mill first supplied corn on September 25, 2007, and Renew paid its outstanding balance three days later by wire transfer.

After this first transaction, however, the parties quickly abandoned both the net 10 and the net 20 standards. Instead, Olsen's Mill supplied grain and invoiced Renew several times per month, but only received payments as Renew had funds available. For the remainder of 2007, Renew ran a balance on its account with Olsen's Mill that at times exceeded $2 million on invoices older than 30 days. Renew paid Olsen's Mill by wire transfer on four occasions in 2007, and once by check. The payments Renew sent were in irregular amounts, not obviously keyed to paying off a particular invoice. The payments varied dramatically in amount, with one exceeding $1.8 million and another amounting to only $3,206.

From January to September 2008, this pattern continued. Olsen's Mill supplied grain multiple times throughout the month, and Renew made payments as funds were available. As Olsen's Mill began to supply more grain, Renew began to run a correspondingly higher balance. Sometimes Renew paid via wire transfer, other times it paid by check. The payments Renew sent continued to be in irregular amounts. Early in 2008, Olsen's Mill also began to call Renew on a near-daily basis, asking that additional funds be sent to pay down the balance. The calls continued into September.

In August 2008 Paul Olsen, a part-owner of Renew and an of officer Olsen's Mill, personally prepared and issued checks from Renew's account to pay Olsen's Mill. The first check, dated August 15, 2008, was for $5,565,747.89. The second check, dated August 22, 2008, was for $1,072,481.08. Renew had to cancel its weekly issuance of checks to other creditors to be sure that these checks would clear.

On September 16, 2008, the practice between the parties changed, as Renew agreed to pay for its corn daily via wire transfer. Renew began sending daily wire transfers in round figures that corresponded to its estimated grain usage for the day. The parties continued this method of prepayment until Renew filed its Chapter 11 petition on January 30, 2009.

Renew filed this adversary proceeding against Olsen's Mill seeking to avoid preferential transfers in the year pre-petition. While this proceeding was pending, I disallowed a priority claim by Olsen's Mill, finding that Renew had prepaid Olsen's Mill from September 16, 2008 until the petition date. Since prepayments during that time period could not have been on an antecedent debt, I granted Olsen's Mill partial summary judgment in this proceeding. Accordingly, only those transfers made between January 30, 2008 and September 15, 2008 are now at issue. Those transfers totaled $95,148,484.51.

Section 547(c) sets forth various affirmative defenses, two of which, "ordinary course" and "new value," were invoked by Olsen's Mill. The burden of proving those defenses rests on Olsen's Mill. § 547(g). Section 547(c) provides that a debtor in possession may not avoid a transfer:

> (2) to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was—
>
> > (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or
> > (B) made according to ordinary business terms;
>
> [. . .]
>
> (4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—
>
> > (A) not secured by an otherwise unavoidable security interest; and
> > (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor;

3

### A. Ordinary Course

Olsen's Mill has carried its burden of showing that the transfers made during the relevant period were within the ordinary course, save for the two checks cut by Paul Olsen. While Renew's transactions with Olsen's Mill were very different from its transactions with other vendors, that fact is not dispositive. Indeed, the 2005 amendments to § 547(c)(2) removed the requirement that a payment be made pursuant to ordinary business terms. The revised statute replaced an "and" with an "or," allowing a preference defendant to show *either* that a payment was ordinary as between the two parties *or* that it was made pursuant to ordinary business terms. The legislative history behind this revision indicates that the purpose was to:

> "leave undisturbed normal financial relations because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy."

H.R. Rep. No. 595, 95th Cong., 1st Sess. 373-74 (1997).

While Renew's payments to Olsen's Mill might have been unusual from an outsider's perspective, they were normal as between the parties throughout the period in question. In 2007, Renew paid Olsen's Mill by check or wire transfer, often well after invoices were due, and in odd amounts based on its cash availability. From January to September 2008, Renew continued to pay based on its cash flow, in odd amounts, not keyed toward paying off its oldest invoices. Sometimes it paid by check; other times it paid by wire. Even the telephone calls made by Olsen's Mill asking for payments were routine for the greater part of the history of transactions between the parties. While no other vendor sought or received payment in this fashion, Olsen's Mill's collection activities were normal as part of their dealings with Renew. The payments

4

between the parties only became "out of the ordinary" when Renew switched to prepayment by daily wire transfers. From January to September 2008, however, Renew and Olsen's Mill maintained a fairly consistent pattern of dealing with their accounts.

Two payments, however, were clearly out of the ordinary. In August 2008, Paul Olsen, used his dual roles as part-owner of Renew and officer of Olsen's Mill to issue checks from Renew's account to pay Olsen's Mill. These two checks totaled $6,638,228.97. Only on those two occasions did Paul Olsen personally direct payments to Olsen's Mill. Indeed, these transactions were so unusual that they forced Renew to cancel its normally scheduled issuance of checks. These two payments cannot be shielded by the ordinary course defense.

### B. New Value

The two transfers initiated by Paul Olsen are, however, shielded by the new value defense. Section 547(a)(2) defines "new value" as

> "money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation."

The new value defense excuses preference liability where a preferred creditor subsequently provided new value to replenish the debtor's estate. In re Globe Bldg. Materials, Inc., 484 F.3d 946 (7th Cir. 2007); In re Prescott, 805 F.2d 719 (7th Cir. 1986). The new value is deemed a "repayment" of the preference liability. Prescott, 805 F.2d at 731.

Olsen's Mill fully replenished Renew's estate after each of the transfers by Paul Olsen. Each sum transferred by Paul Olsen in August 2008 was more than offset by subsequent deliveries of corn on credit. The week after Olsen issued the August 15, 2008 check for $5.5

million, Olsen's Mill delivered approximately $7 million worth of corn to Renew on an unsecured basis. Olsen issued the second check on August 25, 2008 in the amount of $1,072,481.08. The following week, Olsen's Mill sent Renew approximately $5 million worth of corn, again on an unsecured basis. These shipments contributed new value to Renew and allowed it to continue producing ethanol. They more than offset the preferential transfers initiated by Olsen.

Taken together, the ordinary course and new value defenses shield Olsen's Mill from preference liability.

Dated: July 12, 2010

ROBERT D. MARTIN
UNITED STATES BANKRUPTCY JUDGE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

In re:

RENEW ENERGY, LLC                                               (Chapter 11)

        Debtor.                                          Case No. 09-10491

---

Renew Energy, LLC,

        Plaintiff,

v.                                                              Adv. No. 09-154

Olsen's Mill, Inc.,

        Defendant.

---

### ORDER

---

The court having reached the conclusions of law contained in the memorandum decision filed on this date, it is hereby ORDERED that judgment is entered in favor of Olsen's Mill.

Dated: July 12, 2010

_____
ROBERT D. MARTIN
UNITED STATES BANKRUPTCY JUDGE

1